UNITED STATES of America,
Plaintiff-Appellee,

v.

**Pedro M. DIAZ and Susana Diaz,
Defendants-Appellants.**

No. 81–5433.

United States Court of Appeals,
Eleventh Circuit.

Nov. 8, 1982.

---

Joel Hirschhorn, P. A., Miami, Fla., James R. Phelps, Washington, D. C., for defendants-appellants.

Steven E. M. Hartz, Asst. U. S. Atty., Miami, Fla., Robert B. Nicholson, Neil R. Ellis, Jeffrey N. Gibbs, Washington, D. C., for plaintiff-appellee.

Before RONEY and CLARK, Circuit Judges, and TUTTLE, Senior Circuit Judge.

RONEY, Circuit Judge:

Convicted after a jury trial on 40 counts of falsifying records to conceal the practice of "overbleeding" donors at their plasmapheresis centers, defendants Pedro and Susana Diaz raised several points involving amendment of the indictment, jury instructions, materiality of false statements, refusal to acquit, and refusal to dismiss indictment. The keeping of false records being admitted, the ultimate contention on appeal is that such action did not violate 18 U.S.C.A. § 1001. For the reasons stated below we affirm the decision of the district court.

### Background

The Diazes owned and operated two plasmapheresis centers in Miami and Immokalee, Florida. Plasmapheresis is a process by which blood is drawn from a donor, plasma is separated from the red blood cells by centrifuge, and the red blood cells returned to the donor. From the plasma is derived polybrene treated serum (PTS).

The Miami center received its license from the Food and Drug Administration (FDA) in 1975 to produce source plasma (Human) for shipment in interstate commerce. The Miami center also produced PTS. The Immokalee center was registered with the FDA and produced only PTS. In March and April 1976 inspection of both centers disclosed discrepancies or fictitious entries in the records. Further investigation of the Miami center in the summer and fall of 1976 revealed widespread falsification of records. Identifica-tion numbers for the same donor were different. Addresses were false or nonexistent. Names of donors and containers of plasma did not coincide. Donors were overbled. Excess plasma from overbled donors was placed in falsely labeled containers, and personal information was compiled in donors' files when in fact they had not given plasma.

The original indictment contained 54 counts. Count 1 of the indictment charged defendants with conspiracy to violate the FDA Act and 18 U.S.C.A. § 1001. Counts 2–40 charged that defendants had falsely represented that certain individuals donated plasma on certain dates. Counts 41–43 charged that defendants falsely represented that donors had signed informed consent forms as required by FDA regulations. Counts 44–47 charged that defendants falsely represented that donors had received physical examinations at the Miami facility as required by regulation. In counts 48–54 the grand jury charged the Diazes with shipment in interstate commerce of adulterated and misbranded drugs.

After the district court expressed doubt that the PTS was a drug, the Government dropped counts 48–54 and deleted all references to "drug" status in the conspiracy count. The Government also withdrew counts 41–43 involving false statements relating to consent forms. It is important to note that defendants never contested the falsity of the statements in donors' records that formed the basis for counts 2–40. A central theme in the case is that such false statements were of the kind prescribed by 18 U.S.C.A. § 1001. That statute provides that an offense is committed against the United States by anyone who, "in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully ... makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry...." Intertwined through various points on appeal is the notion that the false statements here made were not

properly shown to have been "in any matter within the jurisdiction" of the Food and Drug Administration. To focus on that question properly, it is necessary to understand the regulatory framework for the defendants' business.

### Regulatory Framework

Congress has regulated the donation, manufacture, and use of human blood plasma and serum under two statutes, the Federal Food, Drug and Cosmetic Act, 21 U.S.C.A. § 301 *et seq.* (FDC Act), and the Public Health Service Act, 42 U.S.C.A. § 201 *et seq.* (PHS Act). Both are administered by the Food and Drug Administration (FDA).

The FDA has promulgated a regulatory scheme for biological products. 21 C.F.R. §§ 600–680 (1982). The regulations provide for the registration of establishments collecting or manufacturing blood components. 21 C.F.R. § 607 (1982). Registration does not permit an establishment to ship blood or blood products in interstate commerce. 21 C.F.R. § 607.7(a) (1982). For this a license is required. The FDA grants establishment licenses to facilities which meet its standards. A prerequisite to this grant is the right to inspect the premises and the right to expect accurate labeling. Product licenses specify those products that a licensed establishment may produce provided they are safe, pure, and potent.

The FDA has prescribed additional standards for particular products, including source plasma (human). 21 C.F.R. §§ 640.-60–.76 (1982). The standards serve two important public health purposes: first, to ensure the safety, purity, and potency of the final products; second, to protect the plasmapheresis donor from possible abuse. These abuses include taking excessive quantities of plasma from donors on a frequent basis, poor arm preparation which creates a potential for infection, and inadequate collection procedures which increase the risk of returning to a donor the red blood cells of another. 39 Fed.Reg. 26,161 (1974). While these regulations initially applied only to plasma used in injectable products, in 1974 the FDA pursuant to its authority

to administer the PHS Act proposed to expand the definition of source plasma (human) by deleting the "intended injectable use" limitation. 39 Fed.Reg. 26,164 (1974). In 1976 the FDA promulgated a regulation that defined source plasma (human) as "the fluid portion of human blood collected by plasmapheresis and intended as source material for further manufacturing use." 21 C.F.R. § 640.60 (1982). This expanded definition is important here because the PTS produced by defendants is not used in the manufacture of injectable products. PTS is used in the manufacture of chemistry controls and other types of diagnostic products.

### Indictment

The indictment filed by the grand jury alleged two types of wrongs committed by defendants: first, the making of false statements in violation of 18 U.S.C.A. § 1001, and second, the interstate shipment of the misbranded and adulterated PTS in violation of the FDC Act. The conspiracy count of the indictment accused defendants of conspiring to commit these two substantive offenses. Prior to trial the Government decided to abandon the second claim of FDC Act violations and its parallel allegations in the conspiracy count so that only the first type of wrong remained. The 40-count substantive allegations of making false statements and counterpart provisions in the conspiracy count were tried to the jury.

Defendants never contested the falsity of the statements in the four donor records that formed the basis for the 40 counts. Instead, defendants contended the statements were not within the jurisdiction of the FDA so they were not properly the basis of an 18 U.S.C.A. § 1001 violation.

Defendants maintain that striking the FDC Act violations, which identified PTS as a drug, unlawfully amended the indictment. The indictment as revised by the Government and the count contained no allegations as to the drug status of PTS. Therefore, defendants argue the court's instructions that the drug/device misbranding provisions of the FDC Act permitted the deter-

mination of agency jurisdiction necessary for guilt under 18 U.S.C.A. § 1001 to be based on the conclusion that PTS was either a drug or a device. This, they claim, was a theory not charged in the indictment.

■■■ An indictment may charge a conspiracy with more than one distinct substantive offense, *United States v. Avila-Dominguez,* 610 F.2d 1266, 1270 (5th Cir.), cert. denied, 449 U.S. 887, 101 S.Ct. 242, 66 L.Ed.2d 113 (1980); [1] *Overstreet v. United States,* 321 F.2d 459, 461 (5th Cir. 1963), cert. denied, 376 U.S. 919, 84 S.Ct. 676, 11 L.Ed.2d 615 (1964), and the withdrawal of distinct portions of such a conspiracy charge from jury consideration is permissible, *Salinger v. United States,* 272 U.S. 542, 47 S.Ct. 173, 71 L.Ed. 398 (1926), if the effect is to narrow the issues a defendant is called on to meet. *Thomas v. United States,* 398 F.2d 531 (5th Cir. 1967). The Supreme Court has held that withdrawing a part of a charge from the consideration of the jury does not work an amendment of the indictment, provided nothing is thereby added to the indictment. *Salinger v. United States,* 272 U.S. at 548–49, 47 S.Ct. at 175; *Overstreet v. United States,* 321 F.2d at 461; see 1 *C. Wright & A. Miller, Federal Practice and Procedure,* § 127 at 274–75 (1969). Such was the case here.

The two separate objects of the conspiracy in the indictment were independent. The language in the indictment concerning the conspiracy to make false statements did not focus on an alleged drug status of PTS. The word "drug" never appeared in the 39 false statement substantive counts. The defendants have failed to show that the withdrawal of portions of the conspiracy count had any effect upon the substantive false statement counts on which they were convicted. These counts do not mention PTS at all and allege that defendants made false statements by representing that "certain individuals had donated their plasma on certain dates at the [Miami] facilities . . ., whereas in truth and fact, as they well

knew, such individuals had not . . . ." The Government's decision not to pursue the FDC Act violations did not affect the remaining issues facing defendants. Neither *Ex parte Bain,* 121 U.S. 1, 7 S.Ct. 781, 30 L.Ed. 849 (1887), nor *Stirone v. United States,* 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960), the two cases principally relied on by defendants, are applicable to this situation.

The focus of defendants' argument on this point involves the trial judge's instructions. But the offenses charged simply had to do with the intentional making of false records, and the court committed no reversible error in instructing the jury in accordance with the remaining counts of the indictment that went to trial.

### Jury Instructions

Defendants argue that the district court expanded the scope of the indictment by instructing the jury that one basis for finding the false statements within FDA's jurisdiction was the agency's source plasma (human) regulations. They assert that this somehow transformed the case from a "PTS conspiracy" to a "source plasma (human) conspiracy." They point out that the indictment does not mention source plasma (human). The shifting of this case from a "PTS conspiracy" to a "source plasma (human)" allowed conviction on a theory of criminal liability not charged in the indictment, according to defendants.

■■ The indictment, however, did not allege a "PTS conspiracy" or a "source plasma (human) conspiracy," as defendants believe. It charged defendants with a conspiracy to make false statements as to the facts "within the jurisdiction" of the FDA. Thus the fact that source plasma (human) was not mentioned in the indictment is irrelevant. The indictment did not specify the basis for jurisdiction, but the trial court instructed the jury that two such bases exist. To the extent defendants were fully

1. The Eleventh Circuit, in the en banc decision of *Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir. 1981), adopted as precedent the decisions of the former Fifth Circuit decided prior to October 1, 1981.

aware that the source plasma (human) regulations applied to their licensed facility, it should have been assumed that the Government would invoke the regulation as a basis for jurisdiction. To this end there was no improper shifting of the case. Defendants had notice and opportunity to prepare a defense.

■ Defendants contend they were prejudiced by the trial court's refusal to instruct the jury to consider "whether an agency has consciously acted to exclude an activity from its enforcement scheme" in deciding whether defendants' false statements were "in a matter within the jurisdiction" of the FDA. The district court, however, correctly found jurisdiction and properly determined that this was a question of law which could be decided by the court. *Gonzales v. United States,* 286 F.2d 118, 123 (10th Cir. 1960), *cert. denied,* 365 U.S. 878, 81 S.Ct. 1028, 6 L.Ed.2d 190 (1961); *Pitts v. United States,* 263 F.2d 353, 358 (9th Cir.), *cert. denied,* 360 U.S. 935, 79 S.Ct. 1457, 3 L.Ed.2d 1547 (1959). The charge has been fully considered. It was fair and adequate both from the standpoint of the applicable law and as adjusted to the issues and the evidence.

■ Defendants argue further that the court failed to allow the jury to take into account the decision of the FDA not to regulate products such as PTS at the time of the events alleged. Jurisdiction for purposes of § 1001 has been defined broadly as the power to act. *United States v. Cartwright,* 632 F.2d 1290, 1292 (5th Cir. 1980). Because agency power derives solely from Congress, it is the statutory grant of authority that is determinative rather than its exercise. There can be no question that the FDA at the time defendants were falsifying their donor records had statutory authority to regulate plasmapheresis centers. Under the FDC Act, Congress charged the FDA with the responsibility for ensuring that drugs and devices are not misbranded. In addition, the Supreme Court has consistently interpreted the FDC Act broadly in furtherance of its purpose to protect the public health. *United States v. Park,* 421 U.S.

658, 95 S.Ct. 1903, 44 L.Ed.2d 489 (1975). The fact that the regulations concerning noninjectable products which were proposed in 1974 were not finalized until 1976 does not preclude agency jurisdiction for purposes of 18 U.S.C.A. § 1001.

Misbranding occurs when "labeling is false or misleading in any particular." 21 U.S.C.A. § 352(a). Among the labeling used by defendants were packing lists which contained the names of donors and accompanied shipments of defendants' products. To determine if these lists were accurate, it was necessary to check the donor records. The records were within the FDA's jurisdiction because they provided the basis by which the FDA could determine compliance with the misbranding provisions of the FDC Act. Moreover, under the FDC Act the FDA is authorized to inspect establishments in which drugs or devices "are manufactured, processed, packed, or held, for introduction into interstate commerce...." 21 U.S.C.A. § 374(a).

*Materiality*

Defendants contend that the false statements were immaterial because they were not relied on and could not and did not affect the functions of the Food and Drug Administration. They argue that no regulations required that any records be kept for the manufacture of PTS.

■ To satisfy the element of materiality, it is enough if the statements had a "natural tendency to influence, or be capable of affecting or influencing, a governmental function." *United States v. Markham,* 537 F.2d 187, 196 (5th Cir. 1976), *cert. denied,* 429 U.S. 1041, 97 S.Ct. 739, 150 L.Ed.2d 752 (1977). *See United States v. McIntosh,* 655 F.2d 80, 83 (5th Cir. 1981), *cert. denied,* 455 U.S. 948, 102 S.Ct. 1450, 71 L.Ed.2d 662 (1982); *United States v. Carrier,* 654 F.2d 559, 561 (9th Cir. 1981). The Government does not have to show actual reliance on the false statements. *United States v. Lichenstein,* 610 F.2d 1272, 1278 (5th Cir.), *cert. denied,* 447 U.S. 907,

100 S.Ct. 2991, 64 L.Ed.2d 856 (1980); *United States v. Markham,* 537 F.2d 187 (5th Cir. 1976). A statement can be material even if it is ignored or never read by the agency receiving the misstatement. *United States v. McIntosh,* 655 F.2d at 83. "False statements must simply have the capacity to impair or pervert the functioning of a governmental agency." *United States v. Lichenstein,* 610 F.2d at 1278.

■ The defendants' false records which untruthfully stated the donors and dates could impair the FDA in carrying out its responsibility for protection of the public health. Although they make much of the absence of any requirement that the records be kept for plasma use for noninjectable products, defendants concede that 18 U.S.C.A. § 1001 prohibits false statements generally, and not just those required by law or regulation.

Since defendants kept false records which were material to the enforcement and regulatory responsibilities of the agency, the defendants cannot escape liability just because the agency regulations did not specifically require the keeping of those records. "A citizen may decline to answer the question, or answer it honestly, but he cannot with impunity knowingly and willfully answer with a falsehood." *Bryson v. United States,* 396 U.S. 64, 72, 90 S.Ct. 355, 360, 24 L.Ed.2d 264 (1969).

### Dismissal

Defendants argue that although the court's jury instructions constituted reversible error requiring a new trial and the Government's failure to prove that PTS was a drug as charged in the indictment warranted a judgment of acquittal, the defendants should never have been tried on this indictment in the first place. Specifically, they argue the original indictment tracked the language of inapplicable source plasma (human) regulations and charged the defendants with a variety of supposedly illegal actions, such as bleeding of hepatitis reactive donors and intoxicated donors, which were not illegal in 1975 with regard to PTS. In addition, they argue the grand jury charged that the defendants concealed and destroyed certain records "required by law to be maintained by them" with respect to PTS manufacture, and no FDA requirements existed in 1975 for keeping any PTS records.

The trial court indicated that reliance on inapplicable regulations was caused by an innocent mistake or confusion on the part of the Government. The judge clearly expressed dissatisfaction with the handling of the grand jury proceeding, but he did not believe the law permitted the court to go behind that proceeding.

> The rules governing the operation of a grand jury are much less formal than the rules governing the operation of a trial court. A grand jury need not be convinced beyond a reasonable doubt that a defendant is guilty; if an indictment is valid on its face, it is enough to call for a trial of the charge on the merits.

*United States v. Slepicoff,* 524 F.2d 1244, 1247 (5th Cir. 1975), *cert. denied,* 425 U.S. 998, 96 S.Ct. 2215, 48 L.Ed.2d 824 (1976). The trial court here found the Government had not engaged in misconduct or intentional abuse of the grand jury.

■ Although the proceeding was not as precise as might have been desired, the indictment was sufficient to apprise the defendants of the charges against them. *See United States v. Linetsky,* 533 F.2d 192 (5th Cir. 1976); *United States v. Slepicoff,* 524 F.2d 1244 (5th Cir. 1975), *cert. denied,* 425 U.S. 998, 96 S.Ct. 2215, 48 L.Ed.2d 824 (1976).

AFFIRMED.