**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Paul R. BONANSINGA,
Defendant-Appellant.**

No. 85–1119.

United States Court of Appeals,
Seventh Circuit.

Argued June 18, 1985.

Decided Sept. 18, 1985.

Steven J. Rosenberg, Steven J. Rosenberg, Chicago, Ill., for defendant-appellant.

Patrick J. Chesley, Asst. U.S. Atty., Gerald D. Fines, U.S. Atty., Springfield, Ill., for plaintiff-appellee.

Before CUMMINGS, Chief Judge, and BAUER and EASTERBROOK, Circuit Judges.

BAUER, Circuit Judge.

Defendant, Paul Bonansinga, was indicted in a twenty-seven count indictment stemming from alleged abuse of his positions as a member of the City Council of

Springfield, Illinois and as the Commissioner of the Department of Public Property, commonly known as City Water, Light & Power (CWLP). Defendant was tried before a jury in the Central District of Illinois, found guilty of Counts 22, 23 and 24, involving mail fraud, 18 U.S.C. § 1341, and acquitted of the other charges. The district judge sentenced defendant to a term of eighteen months imprisonment on Count 22 and suspended the imposition of sentence on the other two counts, ordering that defendant be placed on three years concurrent probation after the end of his parole supervision on Count 22. The district court also imposed a $1,000 fine for each of the three counts and ordered defendant to pay $1,685 in restitution as a special condition of probation. We affirm the conviction on Counts 23 and 24, reverse the conviction on Count 22, and remand for a new sentencing determination.

The three counts that form the basis of defendant's conviction all charged that defendant's accomplices, acting for defendant, took automotive supplies that were provided for the use of CWLP by the Springfield Auto Supply Company (Sasco) and S–M–W Auto Supply (SMW). Count 22 charged that defendant improperly received $985 worth of auto supplies. In July 1981 at defendant's request, James Hankins, who worked for CWLP and was a close friend of defendant, went to Sasco to pick up the supplies, which had been pre-ordered. Hankins signed invoices for these supplies but delivered them to defendant for defendant's own use, rather than to CWLP. The bill for these supplies, which Sasco mailed to CWLP on July 25, 1981, is the mailing alleged in Count 22. The city never paid Sasco for these supplies.

Count 23 charged that Patrick Butler, a long-time friend of defendant who was hired to various supervisory positions at CWLP after defendant's election, picked up supplies at the CWLP garage on several occasions during 1981 and 1982 and delivered them to defendant for defendant's own use. The check to pay for these supplies that CWLP mailed to SMW on December 21, 1981, was the mailing asserted to form the jurisdictional basis for this count.

Count 24 charged defendant with receiving $341.92 worth of auto supplies, picked up from SMW by James Hankins and Denton Meyer, another CWLP employee. The check mailed by the city to pay the four vouchers submitted by SMW for these items is the mailing alleged in this count.

■ To prove mail fraud, the government must establish: (1) that defendant participated in a scheme to defraud; and (2) that defendant caused the mails to be used in furtherance of the scheme. *See United States v. Brooks*, 748 F.2d 1199, 1202 (7th Cir.1984); *United States v. Brack*, 747 F.2d 1142, 1146 n. 3 (7th Cir.1984), *cert. denied*, ― U.S. ―, 105 S.Ct. 1193, 84 L.Ed.2d 339 (1985). Defendant first argues that the mailings that the government proved do not satisfy part two of the government's required showing.

■ The mailings in the instant case were between CWLP and the auto supply companies, none of whom were part of defendant's scheme, except to the extent of being victimized by it. However, mailings between innocent parties can support a mail fraud conviction. *See United States v. Lindsey*, 736 F.2d 433 (7th Cir.1984); *United States v. Dick*, 744 F.2d 546 (7th Cir.1984); *United States v. Wormick*, 709 F.2d 454 (7th Cir.1983); *United States v. Galloway*, 664 F.2d 161 (7th Cir.1981), *cert. denied*, 456 U.S. 1006, 102 S.Ct. 2296, 73 L.Ed.2d 1300 (1982). "It is not necessary that the scheme contemplate the use of the mails as an essential element." *Pereira v. United States*, 347 U.S. 1, 8–9, 74 S.Ct. 358, 362–63, 98 L.Ed. 435 (1954). "Where one does an act with knowledge that the use of the mails will follow in the ordinary course of business, or when such use can be reasonably foreseen, even though not actually intended, then he 'causes' the mails to be used." *Id.* at 8–9, 74 S.Ct. at 362–63. After defendant's friend, Hankins, picked up the supplies from Sasco, he signed the invoices that are charged in Count 22. It was forseeable that the mails would be used to send these invoices to CWLP. Sim-

ilarly, when defendant asked Hankins and Meyer to pick up auto supplies at SMW, it was forseeable that CWLP would use the mails to pay for these items by check as charged in Count 24. Count 23, in contrast, is closer to simple theft than the other counts. The items involved in this count were taken by defendant's accomplices from the CWLP garage, not from the sellers of the goods. The mailing alleged was a check sent after the materials had been delivered to CWLP but before some (but not all) of the goods had been expropriated for defendant. Nonetheless, at the time that they placed their orders at the CWLP garage, defendant's aides knew that the supplies that defendant had requested were going to be used by defendant and not CWLP. There was testimony that many of the items paid for by the check alleged in this count were not ordinarily on hand at CWLP. Therefore, defendant's scheme was the cause of the mailing alleged in this count, and the fact that the supplies were picked up from the CWLP garage rather than directly from SMW is immaterial. It is clear that defendant "caused" all of the mailings alleged in the indictment. The question remains, however, whether these mailings were "in furtherance" of the scheme to defraud.

Mailings between two innocent parties, as alleged in this case, are distinct from those found in the majority of mail fraud cases, which involve a mailing between a defendant (or his accomplices) and the intended victim. The mailings alleged in this case can be distinguished from those cases in which the mailing provided funds for further kickbacks to the defendant, *United States v. Primrose*, 718 F.2d 1484 (10th Cir.1984), *cert. denied*, —— U.S. ——, 104 S.Ct. 2352, 80 L.Ed.2d 825 (1984), or the source of the booty for the scheme, *United States v. Cavale*, 688 F.2d 1098 (7th Cir. 1982), *cert. denied*, 459 U.S. 1018, 103 S.Ct. 380; 74 L.Ed.2d 513; 459 U.S. 1208, 103 S.Ct. 1199, 75 L.Ed.2d 441 (1983); *United States v. Stanford*, 589 F.2d 285 (7th Cir. 1978), *cert. denied*, 440 U.S. 983, 99 S.Ct. 1794, 60 L.Ed.2d 244 (1979). Nor can it be said that the mailings in this case served to "lull" the auto supply dealers into a false sense of security. *See United States v. Sampson*, 371 U.S. 75, 78, 83 S.Ct. 173, 174, 9 L.Ed.2d 136 (1962); *United States v. Kuna*, 760 F.2d 813 (7th Cir.1985). That theory has been applied only to mailings from one of the schemers, and to the extent that SMW received checks from CWLP paying for the merchandise (as charged in counts 23 and 24), there was no need to lull it because it ceased being a victim.

The Supreme Court has considered the sufficiency of mailings between innocent parties under 18 U.S.C. § 1341. In *United States v. Maze*, 414 U.S. 395, 400–01, 94 S.Ct. 645, 648–49, 38 L.Ed.2d 603 (1974), the mailing, by a defrauded hotel, of invoices for hotel services that respondent had obtained with a stolen credit card was held to be insufficient to support a mail fraud conviction. Similarly, in *Parr v. United States*, 363 U.S. 370, 80 S.Ct. 1171, 4 L.Ed.2d 1277 (1960), the Court struck down the conviction of members of a school district's Board of Trustees who fraudulently obtained gasoline and other filling station products and services for themselves with the district's credit card. The mailings charged were two invoices mailed by the oil company and, in a separate count, the district's check to the oil company paying one of the invoices. The Court stated, "[t]he scheme in each case had reached fruition when ... the persons intended to receive the [goods and services] had received them irrevocably. It was immaterial to them, or to any consummation of the scheme, how the [oil company] * * * would collect from the [District]. It cannot be said that the mailings in question were for the purpose of executing the scheme as the statute requires." Id. at 393, 80 S.Ct. at 1184 [quotation marks omitted, brackets in the original]. Finally, in *Kann v. United States*, 323 U.S. 88, 65 S.Ct. 148, 89 L.Ed. 88 (1944), the Court held that the depositing bank's mailing to the drawee bank, of a check obtained through petitioner's fraudulent scheme for diverting funds to a dum-

my corporation, was insufficient under 18 U.S.C. § 1341.

■ This court has written that the teaching of *Maze* and *Kann* is that mailings "directed to the end of adjusting accounts between victims of a scheme after the scheme has reached fruition cannot support a mail fraud conviction." *United States v. Wormick*, 709 F.2d 454, 462 (7th Cir.1983). The mailings in the instant case were directed toward adjusting accounts between two victims. Thus, the pertinent question in this case is whether the scheme had reached fruition at the time of the charged mailings. We conclude that it had not.

■ A mailing will support a conviction even if it follows the defendant's fraudulent acts, *United States v. Gorny*, 732 F.2d 597, 601–02 (7th Cir.1984); *United States v. Galloway*, 664 F.2d 161, 164–65 (7th Cir.1981), *cert. denied*, 456 U.S. 1006, 102 S.Ct. 2296, 73 L.Ed.2d 1300 (1982), or occurs after the schemers have obtained the victim's money or goods, *United States v. Sampson*, 371 U.S. 75, 80, 83 S.Ct. 173, 175, 9 L.Ed.2d 136 (1962). Fraudulent schemes cannot often be easily dissected into discrete parts. In *United States v. Lindsey*, 736 F.2d 433 (7th Cir.1984), the appellant was convicted of causing the "salvage value" designation to be deleted from the title before the wholesale sale of used automobiles, and in *United States v. Galloway*, the appellant was convicted of rolling back the odometer readings on automobiles before their wholesale sale. The mailings in both cases occurred after the appellants had obtained money for the cars, and consisted of title documents mailed from, and to, respectively, the Illinois Secretary of State and the Wisconsin Department of Transportation. The title documents were necessary for the retail customers to perfect title to the automobiles.[1] In *Lindsey* and *Galloway,* we noted that any failure of title would hurt the appellants' dealings with auto auctions and wholesalers in the future; thus the scheme did not reach fruition until the retail customers had perfected title. Similarly, in *United States v. Wormick,* 709 F.2d 454, 462 (7th Cir.1983), we held that a check from a defrauded insurance company to an innocent car rental agency was in furtherance of the scheme to defraud. Defendant, a police officer, was convicted of submitting false accident and theft reports to assist others in filing false claims to their insurance company. The insurance company check was a sufficient mailing because it helped to conceal the fraud. Had no one involved in the purported accident temporarily rented a replacement car, the insurance company might have become suspicious. In the instant case, it is quite likely that CWLP orders were backed by the full faith and credit of the city, and the record shows that there were many auto dealers in Springfield. Nonetheless, the Count 23 check mailed by CWLP for goods defendant's co-workers took from the CWLP garage furthered the scheme by smoothing the relationship between CWLP and SMW and making it easier for Hankins and others to get supplies from SMW in the future. In addition, had SMW not been paid on December 21, 1981, it would have made inquiries and possibly triggered an investigation. The payment helped to conceal defendant's fraud, and allowed him to continue taking goods from the CWLP garage throughout 1982.

1. In contrast, in the instant case, check and invoice mailings were not necessary to perfect title to the goods misappropriated by defendant. Under the Uniform Commercial Code, as adopted in Illinois, title was perfected when the goods were delivered, ILL.ANN.STAT. ch. 26 § 2–401(2) (Smith-Hurd 1963), either when defendant caused them to be picked up from the supplier's place of business (Counts 22 and 24), or when they were shipped to CWLP (Count 23). The supplies furnished were mostly paints, sandpaper, and other consumables; therefore, under the U.C.C. the probable remedy for Sasco and SMW for nonpayment following delivery would be an action for the price of the goods, not repossession. *Victorian Inns, Inc. v. Benda,* 22 Ill.App.3d 247, 317 N.E.2d 287 (1974); ILL. ANN.STAT. ch. 26, §§ 2–703, 2–709 (Smith-Hurd 1963). *But cf.* ILL.REV.STAT. ch. 26 § 2–403(1) (Smith-Hurd 1963) (indicating that a purchaser misrepresenting his identity has a voidable title).

Count 24 presents a closer case. The check in this count was mailed on February 3, 1983. Defendant is not charged with having taken any auto supplies in 1983, and argues that the scheme had reached fruition by that date. However, defendant did not simply defraud the city of property that it owned; the indictment alleges that he also deprived citizens of his loyal, honest, and faithful service, free from the influence of corruption, collusion and dishonesty. *See United States v. Lea,* 618 F.2d 426, 429 (7th Cir.), *cert. denied,* 449 U.S. 823, 101 S.Ct. 82, 66 L.Ed.2d 25 (1980); *United States v. Bush,* 522 F.2d 641, 646–49 (7th Cir.1975), *cert. denied,* 424 U.S. 977, 96 S.Ct. 1484, 47 L.Ed.2d 748 (1976); *United States v. Isaacs,* 493 F.2d 1124, 1149–1150 (7th Cir.1974), *cert. denied,* 417 U.S. 976, 94 S.Ct. 3184, 41 L.Ed.2d 1146 (1974). Not only did defendant take auto supplies, there was evidence that he extorted $32,000 in kickbacks from a CWLP coal supplier, used CWLP materials and labor to construct a garage at his residence, and took an orbital sander purchased by CWLP. The indictment charges that this corruption persisted through the date of defendant's indictment in July 1984. In particular, James Faulkner testified that he approached Hankins in the spring of 1983 about getting his wife a job with CWLP, and eventually offered to pay $5,500. According to Hankins, Falkner paid $5,500 cash in May 1983, and Hankins, in turn, gave $4,000 to defendant. Faulkner's wife was later hired. Defendant schemed to deprive the citizens of Springfield of their right to faithful service free from the influence of corruption. If any part of his dishonesty came to light, the entire scheme might fail. While it is true that the jury acquitted defendant of selling jobs, this does not mandate the conclusion that defendant's overall scheme had reached fruition by 1983. *See United States v. Chappell,* 698 F.2d 308, 310 (7th Cir.) *cert. denied,* 461 U.S. 931, 103 S.Ct. 2095, 77 L.Ed.2d 304 (1983). The jury might have been exercising it's "historic power of lenity." *United States v. Carbone,* 378 F.2d 420, 423 (2d Cir.), *cert. denied,* 389 U.S. 914, 88 S.Ct. 242, 19 L.Ed.2d 262 (1967). Juries frequently convict on some counts but acquit on others because of compassion or compromise. *United States v. Fox,* 433 F.2d 1235, 1238 & n. 22 (D.C.Cir.1970).

In addition, the present case is strikingly similar to *United States v. Dick,* 744 F.2d 546 (7th Cir.1984), in which a mailing between two victims of a scheme that ultimately determined who bore the loss was held to be sufficient to support a mail fraud conviction. The defendant was an attorney for Heritage Insurance Company, a surety. He was convicted of participating in a scheme to rig bids for a contract to complete a construction project. Defendant used his position to assure that a particular concrete subcontractor was selected, and this person in turn let the project to another subcontractor at half the price. The evidence that defendant had personally received any pecuniary gain from the fraud was unclear. *See id.* at 551. He argued that reimbursement checks from the Small Business Administration (SBA) to Heritage were not in furtherance of the scheme, apparently because they were mailed after the surrepetitious subcontractor had been fully paid. *Id.* at 552 n. 10. This court held that reimbursement checks from SBA to Heritage were chargeable mailings. Although Heritage was an innocent victim of the scheme, this court concluded that the scheme did not reach fruition until the SBA had reimbursed the sureties. This court stated:

The reimbursements, however, were part of the fruit of the scheme. Dick knew that the SBA would cover ninety percent of the sureties' loss on the [original defaulting subcontractor's] bond. Also aware of that fact, Heritage may have given Dick more leeway than it would have otherwise in letting the completion contract. Further, the regulations promulgated under the statutory mandate for the guarantee program require sureties, in order to qualify for the SBA guarantee, to affirm that without

the guarantee they would not issue the bond to the principal.

*Id.* at 552.

■ We conclude that the checks mailed, as charged in Counts 23 and 24, helped to keep defendant's scheme concealed, made it easier for defendant's accomplices to continue dealing with the merchants involved, and thus, were in furtherance of the scheme. Although the mailings were simply directed towards settling accounts between victims, they occurred before defendant's scheme had reached fruition, and therefore support his conviction under 18 U.S.C. § 1341.[2]

■ On the other hand, the invoice mailing charged in Count 22 was not in furtherance of the scheme, but worked against it, and the conviction on that count cannot stand. Although the mailing occurred on July 25, 1981, and this was before the scheme had reached fruition, the mailing made it more likely that defendant's scheme would be detected. We find this mailing to be indistinguishable from the one found insufficient in *United States v. Maze,* 414 U.S. 395, 400–01, 94 S.Ct. 645, 648–49, 38 L.Ed.2d 603 (1974). Rather than concealing the fraud, this mailing put CWLP on notice that Hankins was receiving materials in its name, and the mailing could have prompted an audit that might have revealed that the automotive supplies were never used on CWLP equipment. "Indeed, from [defendant's] point of view, he probably would have preferred to have the invoices misplaced by [Sasco] and never mailed at all." *Maze,* 414 U.S. at 402, 94 S.Ct. at 649. "Congress could have drafted the mail fraud statute so as to require only that the mails be in fact used as a result of a fraudulent scheme. But it did not do this; instead it required that the use of the mails be 'for the purpose of executing such scheme or artiface...'" Id. at 405, 94

S.Ct. at 651. We reverse the conviction on Count 22.

■ Defendant next argues that there was insufficient evidence to link him with the stolen supplies. In reviewing the sufficiency of the evidence produced at trial, we must consider whether, taking the view most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *United States v. Moya,* 721 F.2d 606, 609–10 (7th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 1312, 79 L.Ed.2d 709 (1984). Hankins testified that defendant asked him to get the materials charged in Count 24, and that he personally took them to defendant. Government Exhibit 324 consists of the invoices from SMW for the materials paid for by the check that constitutes the mailing charged in Count 23. Both Butler and Catalano testified that they obtained sandpaper, doublefaced buffing pads, and # 7447 3M sanding pads for defendant, all of the type described in the invoice. A jury could reasonably infer that these items matched those charged in this count. In any event, as long as there is a sufficient nexus between the use of the mails and the fruits of an on going scheme, it is not necessary to match item for item stolen money or property with an individual mailing. *Cf. United States v. Lea,* 618 F.2d 426, 431 (7th Cir.1980), *cert. denied,* 449 U.S. 823, 101 S.Ct. 82, 66 L.Ed.2d 25 (1980). Defendant was convicted of perpetrating a continuing scheme to defraud the city and the citizens of Springfield of materials to be paid for by CWLP, and of his honest and faithful service. We conclude that there was sufficient evidence to convict defendant of mail fraud on Counts 23 and 24.

■ Finally, defendant argues that there was no scheme to defraud in this

---

**2.** While one mailing found to be insufficient in *Parr v. United States,* 363 U.S. 370, 392–93, 80 S.Ct. 1171, 1184, 4 L.Ed.2d 1277 (1960), was a single check from the school district paying the oil company for gasoline obtained by defend-ants, there was no finding in *Parr* that the petitioners were involved in an ongoing, virtually perpetual scheme, as was defendant. Further, the Court did not address the benefit that petitioners obtained through concealment.

case, only a series of isolated transactions. We disagree. Congress has decided not to define "scheme or artiface to defraud," because the range of potential schemes is as broad as the criminal imagination. *See United States v. Lemire,* 720 F.2d 1327, 1335 (D.C.Cir.1983), *cert. denied,* ⸺ U.S. ⸺, 104 S.Ct. 2678, 81 L.Ed.2d 874 (1984). Defendant embarked on a persistent pattern of taking property that was to be paid for by the city, and of depriving the citizens of Springfield of his loyal and honest service. Defendant's repeated fraudulent actions were not accidental, and we have no difficulty in concluding that a scheme existed here, as the meaning of that word has evolved in the case law.

Defendant's conviction on Counts 23 and 24 is AFFIRMED, and his conviction on Count 22 is REVERSED. We vacate the sentence and remand the case to the district judge for a new sentencing determination on the two existing counts.