UNITED STATES of America

v.

Arthur G. LANG, III, and Thomas C. Trexler.

Crim. No. WN–90–0404.

United States District Court, D. Maryland.

Feb. 21, 1991.

Breckinridge L. Willcox, U.S. Atty., and Carmina S. Hughes, Asst. U.S. Atty., D. Md., Baltimore, Md., for the Government.

Julian S. Greenspun, Richard S. Kraut and Storch & Brenner, Washington, D.C., for defendant Lang.

Stephen H. Sachs, Arthur F. Mathews, Michael E. Herde and Wilmer, Cutler & Pickering, Washington, D.C., for defendant Trexler.

## MEMORANDUM AND ORDER

NICKERSON, District Judge.

On October 17, 1990, a federal grand jury sitting in the District of Maryland indicted defendants Arthur G. Lang, III ("Lang") and Thomas C. Trexler ("Trexler"), charging them with one count of making a false statement within the jurisdiction of a federal agency, 18 U.S.C. § 1001, twelve counts of securities fraud, 15 U.S.C. §§ 78j(b) and 78ff, 17 C.F.R. § 240.10b–5, and one count of conspiracy to make false statements and commit securities fraud, 18 U.S.C. § 371.

According to the indictment[1], defendants Lang and Trexler were at all relevant times officers of Insituform East, Inc. ("IEI"), a publicly-owned Delaware corporation headquartered in Landover, Maryland and engaged in the business of underground sewer and pipeline rehabilitation and repair. IEI's common stock was registered with the Securities and Exchange Commission ("SEC") pursuant to Section 12(g) of the Securities Exchange Act of 1934 ("1934 Act"), 15 U.S.C. § 78*l* (g), and was publicly traded "over the counter" on the NASDAQ, a national securities exchange. As a publicly traded company, IEI was required to make periodic filings with the SEC, including quarterly reports on Form 10–Q, to inform the public of its financial condition.

Count 1 of the indictment alleges that from September, 1985 to May 7, 1987, in the state of Maryland, defendants conspired to trade in the securities of IEI based upon material non-public information concerning IEI's earnings for the 1986 fiscal year, and that defendants accomplished the conspiracy in part by falsifying the books and records of IEI. The indictment alleges that the effect of this scheme was to "mask [IEI's] true financial condition to the public resulting in artificially increasing the market price of IEI stock owned by [the defendants]." (Count 1, ¶ 10) The indictment further alleges that "[b]y trading when [defendants] knew that loss was imminent, [defendants] were able to sell their stock and amass large profits in a short period of time before the market responded to the public disclosure of the fourth quarter loss at which time the price of IEI stock dropped dramatically." (Count 1, ¶ 10)

Count 1 also alleges that defendants conspired to file false and fraudulent Form 10–Qs with the SEC in violation of 18 U.S.C. § 1001 and that defendants sold their IEI stock in 1986 armed with material non-public information concerning IEI's earnings for the 1986 fiscal year in violation of 15 U.S.C. §§ 78j(b), 78ff, and 17 C.F.R. § 240.10b–5.

Count 2 charges defendants with making and causing to be made a false statement

1. The original indictment was filed on October 17, 1990. The Government filed a superseding indictment on October 24, 1990. All references to "the indictment" hereinafter will include the superseding indictment.

to the SEC. The Count alleges that defendants filed a quarterly report on SEC Form 10–Q for the third quarter ending March 31, 1986 that contained false statements concerning IEI's income and expenses. Section 13(a) of the 1934 Act requires the filing of such quarterly reports to provide the investing public with information concerning the financial condition of public companies.

Counts 3 through 14 charge defendants with selling IEI's securities between April and July, 1986 while in possession of confidential non-public information concerning IEI's earnings for the 1986 fiscal year. Each count lists the name of the seller, the IEI shares sold, the proceeds of the sale and the date of sale.

Defendants have filed several pretrial motions. Defendant Lang has filed a Motion to Dismiss Count 2 of the Superseding Indictment. Defendant Trexler has filed a Motion to Dismiss the Superseding Indictment and a Motion to Set a Pre–Trial Return Date For Fed.R.Crim.P. 17(c) Subpoenas *Duces Tecum.* Each defendant has adopted the other's motions. The United States of America (the "Government") opposes these motions, and the SEC has filed a Motion to Quash the Subpoena *Duces Tecum.*

After a careful review of the pleadings and after a hearing on the motions, the Court will deny the defendants' pretrial motions and grant the SEC's Motion to Quash the Subpoena. The Court will address each of defendants' motions separately below.

## I. MOTION TO DISMISS THE INDICTMENT

### A. *Count 2*

1. Liability under 18 U.S.C. § 1001 For Misstatements or Omissions in Informational Reports Filed under Section 13(a)

■ Defendants argue that Count 2 should be dismissed because the false

statement statute, 18 U.S.C. § 1001, does not reach false material filings made in reports, such as those required under Section 13(a) of the 1934 Act to be filed with the SEC.[2] Defendants first argue that the false statement statute is preempted by Section 32(a) of the 1934 Act which imposes criminal penalties for violations of the Act's reporting requirements. Defendants assert that by charging them under 18 U.S.C. § 1001, rather than the more specific securities law provisions, the Government is seeking to circumvent the stringent requirements for false filing prosecutions under Section 32(a).

■ 18 U.S.C. § 1001 provides:

Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both.

This statute was designed "to protect the authorized functions of governmental departments and agencies from the perversion which might result from the deceptive practices described." *United States v. Gilliland,* 312 U.S. 86, 93, 61 S.Ct. 518, 522, 85 L.Ed. 598 (1941). To support a violation of Section 1001, the Government must establish that the defendant (1) made a false statement (2) of material fact with (3) fraudulent intent and (4) in relation to a matter within the jurisdiction of a department or agency of the United States. *United States v. Race,* 632 F.2d 1114, 1116 (4th Cir.1980).

**2.** Section 13(a)(2), 15 U.S.C. § 78m(a)(2), requires every issuer of a security registered under Section 12(g) of the Act to file "such annual ... and such quarterly reports ... as the Commission may proscribe." SEC Rule 13a–13, 17 C.F.R. § 240–13a–13, sets forth the requirements for filing quarterly reports on Form 10–Q, the report at issue in this case.

By contrast, Section 32(a)[3] sanctions criminal penalties for misstatements or omissions in reports filed with the SEC only if they are made "willfully and knowingly" and are misleading "with respect to any material fact." *See United States v. Dixon,* 536 F.2d 1388, 1396 (2d Cir.1976). Section 32(a) also provides defendants with a "no knowledge" defense to imprisonment which is not available under 18 U.S.C. § 1001.

Defendants argue that Congress did not intend 18 U.S.C. § 1001 to reach misstatements or omissions in informational reports filed with the SEC under Section 13(a) of the 1934 Act. Defendants assert that the unique legislative history of Sections 1001 and 32(a) supports their argument. They point out that at the time Section 1001 was enacted—only 12 days after the 1934 Act was passed—it provided harsher penalties than Section 32(a), though the requirements for conviction under Section 1001 were less stringent. Defendants find it untenable that in passing the general false statements statute Congress intended to repeal the more detailed provisions of Section 32(a) that it had just enacted.

█ It is well settled that "when an act violates more than one criminal statute, the Government may prosecute under either so long as it does not discriminate against any class of defendants." *United States v. Batchelder,* 442 U.S. 114, 123–24, 99 S.Ct. 2198, 2204, 60 L.Ed.2d 755 (1979). Moreover, courts have permitted prosecution under Section 1001 despite the existence of other overlapping and more specific false statement statutes. *United States v. Gordon,* 548 F.2d 743, 744 (8th Cir.1977); *see, e.g., United States v. Hartness,* 845 F.2d 158, 162–63 (8th Cir.), *cert. denied,* 488 U.S. 925, 109 S.Ct. 308, 102 L.Ed.2d 326 (1988); *United States v. Fern,* 696 F.2d 1269, 1274 (11th Cir.1983); *United States*

*v. Grotke,* 702 F.2d 49, 54 (2d Cir.1983); *United States v. Eisenmann,* 396 F.2d 565, 568 (2d Cir.1968).

In *United States v. Bilzerian,* 926 F.2d 1285 (2d Cir.1991), the Second Circuit rejected the same argument raised here by defendants. In that case, the Court held that the Government could prosecute under 18 U.S.C. § 1001 alleged false statements in reports filed under Section 13(d) of the 1934 Act. After reviewing the legislative history of Sections 1001 and 32(a), the Court found that the:

> proximity of the enactments without more does not suggest that the application of the false statements statute was to be limited to the just-enacted securities law. Absent more explicit indicia of Congressional purpose to foreclose the use of § 1001, the general rule that criminal statutes may overlap controls. The fact that less proof is required for conviction under § 1001 does not amount—as defendant alleges—to overriding the requirements of § 32(a).

*Id.* at 1300.

In the present case, defendants have failed to point to any express indication that Congress intended Section 32(a) to preempt Section 1001. This Court, therefore, finds that the general canon of construction applies, and that the Government may prosecute the alleged false statements under either Section 32(a) or Section 1001.

█ Defendants further argue that Section 13(a) reports are not "within the jurisdiction" of the SEC because they simply provide information to the public, without requiring or contemplating any action by the SEC. In defendants' view, Section 1001 is appropriate only where the misstatements or omissions are (1) made during an active governmental inquiry or (2)

---

**3.** Section 32(a) provides in pertinent part:

Any person who willfully violates any provision of this chapter ... or any rule or regulation thereunder the violation of which is required under the terms of this chapter, or any person who willfully and knowingly makes, or causes to be made, any statement in any ... report ... required to be filed under this chapter or any rule or regulation thereunder

... which statement was false, shall upon conviction be fined ... or imprisoned ... or both ...; but no person shall be subject to imprisonment under this section for the violation of any rule or regulation if he proves that he had no knowledge of such rule or regulation.

15 U.S.C. § 78ff(a).

formed the basis for some sort of affirmative governmental action.

Section 1001 prohibits deceptive conduct if it falls "within the jurisdiction of any department or agency of the United States." 18 U.S.C. § 1001. The Supreme Court has given a broad reading to the jurisdiction requirement in Section 1001. *See, e.g., United States v. Rodgers,* 466 U.S. 475, 479–80, 104 S.Ct. 1942, 1946–47, 80 L.Ed.2d 492 (1984) ("'jurisdiction' term should be treated as broadly as possible); *Bryson v. United States,* 396 U.S. 64, 70, 90 S.Ct. 355, 359, 24 L.Ed.2d 264 (1969) ("the term 'jurisdiction' should not be given a narrow or technical meaning for purposes of § 1001").

■ Jurisdiction is bestowed by any statutory basis for the agency's access to the information and occurs wherever a false statement relates in some way to a matter in which a federal agency has the power to act. *See Bryson v. United States,* 396 U.S. at 71, 90 S.Ct. at 359–60 ("[a] statutory basis for an agency's request for information provides jurisdiction enough to punish fraudulent statements under § 1001"); *United States v. Rodgers,* 466 U.S. at 479–80, 104 S.Ct. at 1946–47 (agency has jurisdiction within meaning of § 1001 when it has authority to act upon the information).

Here, the Form 10–Q falls within the jurisdiction of the SEC for purposes of Section 1001 because the 1934 Act requires the filing of this report under Section 13(a) with the SEC. 15 U.S.C. § 78m(a),(b). Furthermore, the SEC is authorized to regulate the content of Section 13(a) filings and prosecute violations of law based on them. 15 U.S.C. §§ 78m(b)(1), 78u; *see United States v. Hansen,* 772 F.2d 940, 943–44 (D.C.Cir.1985) (term "jurisdiction" in § 1001 embraces authority to conduct official inquiry), *cert. denied,* 475 U.S. 1045, 106 S.Ct. 1262, 89 L.Ed.2d 571 (1986); *see also e.g., United States v. Diaz,* 690 F.2d 1352, 1357 (11th Cir.1982); *United States v. Di Fonzo,* 603 F.2d 1260, 1263–64 (7th Cir.1979), *cert. denied,* 444 U.S. 1018, 100 S.Ct. 672, 62 L.Ed.2d 648 (1980); *United States v. Fields,* 592 F.2d 638, 649 (2d Cir.1978), *cert. denied,* 442 U.S. 917, 99 S.Ct. 2838, 61 L.Ed.2d 284 (1979).

In *Bilzerian,* 926 F.2d at 1300–01, the Second Circuit addressed a similar situation and found that prosecution under Section 1001 was proper. In that case, defendants argued that false statements made on Forms 13D and 14D–1 were not matters "within the jurisdiction" of the SEC and thus could not be prosecuted under Section 1001. Like the Form 10–Qs in this case, the Forms at issue in *Bilzerian* were also required by law to be filed with the SEC. *See* Section 13(d)(1); 15 U.S.C. §§ 78m(d)(1), 78n(d). After finding a statutory basis for the SEC's request for information in the Schedules and after noting that the SEC was authorized to regulate the content of the documents and pursue violations, the Second Circuit stated:

[a]lthough the SEC may not act on every Schedule 13D, the filing of a false statement may interfere with its investigatory and enforcement function, including its determination whether or not to investigate a transaction. The securities laws are designed to make accurate information available to the investing public; the SEC's authority to regulate disclosure required under those laws brings the securities filings at issue within its jurisdiction for purposes of § 1001.

*Id.* at 1301.

Applying the *Bilzerian* Court's analysis, this Court rejects defendants' argument on this point. Because the Form 10–Q is required by law to be filed with the SEC under the 1934 Act and because the SEC has the authority to regulate the content of these filings and pursue violations of law based on them, the Court concludes that the Form 10–Q falls within the jurisdiction of Section 1001. Accordingly, the Court will deny defendants' motion to dismiss Count 2 on this basis.

2. Failure to State an Offense and Give Adequate Notice

Defendant Lang argues that Count 2[4] should be dismissed because it fails to ade-

---

**4.** Count 2 alleges:

1. That the allegations contained in para-

quately state an offense under 18 U.S.C. § 1001. Lang points out that Count 2 charges only that defendants caused to be filed a Form 10–Q "which contained false statements concerning IEI's income and expenses." Lang contends that this Count is defective because "it [does] not allege each false figure, the period to which it pertained, and, what that alleged true figure was with respect to each alleged false figure." ·

Defendant Trexler also argues that Count 2 should be dismissed. Trexler claims that Count 2 fails to satisfy the notice requirement of the Sixth Amendment because it does not identify the allegedly false statements in the Form 10–Q. Specifically, Trexler complains that Count 2 does not notify the defendants which of the "income" and "expense" items addressed in the Form 10–Q are false. Trexler notes that because the Form 10–Q contains information from four different financial reporting periods that encompass a time span from July 1, 1984 to March 31, 1986, defendants "are left to guess which of these financial entries they will be called upon to defend at trial."

Defendant Trexler further argues that in determining the sufficiency of Count 2, the Court can not refer to any other allegations in the indictment which are not specifically incorporated by reference into Count 2. Defendants rely on *United States v. Hooker*, 841 F.2d 1225 (4th Cir.1988) (en banc) to support their argument that Count 2 must stand alone in assessing its validity.

■ The test to determine the sufficiency of an indictment is well established. An indictment is sufficient if it: 1) alleges the essential elements of the offense charged and provides the defendant with notice of the crime with which he is charged; and 2) enables the defendant to plead double jeopardy in any future prosecution for the same offense. *Hamling v. United States*, 418 U.S. 87, 117, 94 S.Ct. 2887, 2907–08, 41 L.Ed.2d 590 (1974); *Russell v. United States*, 369 U.S. 749, 763–64, 82 S.Ct. 1038, 1046–47, 8 L.Ed.2d 240 (1962); *United States v. Hooker*, 841 F.2d at 1230.

■ It is generally sufficient for an indictment to allege the offense in the words of the statute and state the time and place of the alleged offense so long as the words of the statute "fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offense." *United States v. Carll*, 105 U.S. 611, 612, 26 L.Ed. 1135 (1882) *quoted in Russell v. United States*, 369 U.S. at 765, 82 S.Ct. at 1047; *see, e.g., Hamling v. United States*, 418 U.S. at 117, 94 S.Ct. at 2907–08; *United States v. London*, 550 F.2d 206 (5th Cir.1977); *United States v. Tramunti*, 513 F.2d 1087, 1113 (2d Cir.), *cert. denied*, 423 U.S. 832, 96 S.Ct. 55, 46 L.Ed.2d 50 (1975). Moreover, in viewing the sufficiency of an indictment, courts should be governed by practical not technical considerations. *United States v. Mouton*, 657 F.2d 736, 739 (5th Cir.1981); 1 C. Wright, *Federal Practice & Procedure: Criminal*, § 125 at 385 (2d ed. 1982).

■ In light of these principles, it is clear that Count 2 contains all the essential elements of a false statement charge, informs the defendants of the charges against them and allows the defendants to plead double jeopardy in any future prosecution involving the same offense. Count 2 tracks the statutory language of 18 U.S.C. § 1001, it apprises the defendants of the place the offense occurred, and it identifies

graphs 1 through 8 of Count One are realleged and incorporated herein as though fully set out in this Count.
2. On or about May 12, 1986, in the State and District of Maryland,
ARTHUR G. LANG, III
and
THOMAS C. TREXLER
did knowingly and willfully make and cause to be made a false, fictitious and fraudulent statement and representation as to material facts in a matter within the jurisdiction of the

Securities and Exchange Commission (SEC), an agency of the United States, in that they filed and caused to be filed a Form 10–Q for IEI for the Third Quarter ended March 31, 1986 of the fiscal year 1986 with the SEC which contained false statements concerning IEI's income and expenses, whereas, in truth and fact, as they then well knew, IEI's actual income was less than the stated figure and IEI's expenses were greater than those stated resulting in the actual profit being less than that shown on the Form 10–Q.

the document that contains the false statement. Specifically, it states that on May 12, 1986 in Maryland, the defendants made a false statement to the SEC in their Form 10–Q for the third quarter ending March, 1986. It further alleges that IEI's actual profit was less than that shown on the Form 10–Q.

Although Count 2 does not identify the exact false entries which comprise the allegedly fictitious income and expenses on the Form 10–Q, the Court does not interpret the law to require dismissal of the Count on this basis.

In *United States v. Bernstein*, 533 F.2d 775 (2d Cir.), *cert. denied*, 429 U.S. 998, 97 S.Ct. 523, 50 L.Ed.2d 608 (1976) the Second Circuit reviewed the sufficiency of a false statement count under 18 U.S.C. § 1010 and rejected an argument similar to the one made here by defendants. In that case, the Court did not find a violation of the Sixth or Fifth Amendments even though the false statement count failed to specify or identify the specific statements alleged to be false. *Id.* at 786. The Court stated that:

> [t]he counts are particular in that they specify the property involved which serves to fix and identify the particular false document. It is the submission of the false document which constitutes the separate crime. While some identification is required, it is not necessary that the indictment itself go into evidentiary matters. The offense was fully and clearly charged, since the indictment specified the time and place of the transaction and the submission of a particular false application in respect to a particular piece of property.

*Id.* (citations omitted); *see United States v. Alo*, 439 F.2d 751, 756 (2d Cir.) (indictment for obstruction of justice by giving "false and evasive answers" before SEC sufficient although not specifying the false and evasive answers), *cert. denied*, 404 U.S. 850, 92 S.Ct. 86, 30 L.Ed.2d 89 (1971); *Cooper v. United States*, 282 F.2d 527 (9th Cir.1960) (failure to specify amount of allegedly false income in 18 U.S.C. § 1001

action did not require dismissal of indictment).

Here, Count 2's failure to set forth the specific false entries alleged does not require its dismissal. The Count follows the statutory language and alleges a false statement; the requisite evidentiary detail exists elsewhere in the indictment. *See* Count 1, ¶¶ 14, 15, 16. The Court, therefore, rejects Defendant Lang's argument that Count 2 does not contain all the essential elements of a false statement charge.

Defendant Trexler's reliance on *Hooker* to support his notice argument is misplaced. In that case, the Fourth Circuit held that a missing element can not be read into an indictment from another count where the challenged count fails to incorporate the other counts by reference. *Id.* at 1231. Because this Court finds that Count 2, standing alone, sets forth all the essential elements of 18 U.S.C. § 1001, *Hooker* does not preclude the Court from looking at allegations in Count 1, which are not incorporated by reference into Count 2, to identify the facts underlying the elements of the false statement count. *Cf. United States v. Bernstein*, 533 F.2d at 786–87.

■ In reaching this conclusion, the Court recognizes that even though the indictment must provide some identification of the false statement allegedly made in the Form 10–Q, the indictment need not set forth every evidentiary detail necessary to establish the elements of the offense. *United States v. Cauble*, 706 F.2d 1322, 1334 (5th Cir.1983), *reh'g denied*, 714 F.2d 137 (5th Cir.), *cert. denied*, 465 U.S. 1005, 104 S.Ct. 996, 79 L.Ed.2d 229 (1984).

In sum, the Court finds that although Count 2 is not as precise as might be desired, it sufficiently sets forth the essential elements of 18 U.S.C. § 1001 and the indictment fairly informs the defendants of the charges against them and enables them to plead double jeopardy in any future prosecution for the same offense. Accordingly, the Court will deny defendants' motion to dismiss Count 2 on this basis.

### 3. Improper Venue

Defendants next complain that Count 2 should be dismissed because venue is not

proper in this district. Relying on *Reass v. United States*, 99 F.2d 752 (4th Cir.1938) and *Travis v. United States*, 364 U.S. 631, 81 S.Ct. 358, 5 L.Ed.2d 340 (1961), defendants argue that proper venue lies in the District of Columbia where the Form 10–Q was filed, rather than in this district where the Form was prepared.

■ The Sixth Amendment mandates trial in the "State and district wherein the crime shall have been committed," and proof of venue is therefore an essential part of the government's case. *United States v. Blecker*, 657 F.2d 629, 632 (4th Cir.1981), *cert. denied*, 454 U.S. 1150, 102 S.Ct. 1016, 71 L.Ed.2d 304 (1982). When, as in the present case, the statute defining the substantive offense "does not indicate where Congress considered the place of committing the crime to be, the *locus delicti* must be determined from the nature of the crime alleged and the location of the act or acts constituting it." *United States v. Anderson*, 328 U.S. 699, 703, 66 S.Ct. 1213, 1216, 90 L.Ed. 1529 (1946) (citations omitted).

■ In determining the act or acts committing the crime, the Fourth Circuit focuses on the verbs employed in the statute defining the offense. *See United States v. Blecker*, 657 F.2d at 632; *United States v. Walden*, 464 F.2d 1015, 1018 (4th Cir.1972), *cert. denied sub nom. Cook v. United States*, 410 U.S. 969, 93 S.Ct. 1436, 35 L.Ed.2d 705 (1973); *Newton v. United States*, 162 F.2d 795, 796 (4th Cir.1947), *cert. denied*, 333 U.S. 848, 68 S.Ct. 650, 92 L.Ed. 1130 (1948). When the crime is composed of distinct parts or is begun in one district and completed in another, venue may be proper in more than one district. 18 U.S.C. § 3237; *United States v. Johnson*, 337 F.2d 180, 194 & 194 n. 22 (4th Cir.1964), *aff'd* 383 U.S. 169, 86 S.Ct. 749, 15 L.Ed.2d 681 (1966).

■ Applying these principles to the facts of the case, the Court must look at the key verbs in the statute. The key

verbs in 18 U.S.C. § 1001 are those that proscribe the making or using of any false writing or document knowing it to contain false statements. In this case defendants are charged with making or causing to be made false statements within the District of Maryland in IEI's Form 10–Q and presenting this Form to the SEC in the District of Columbia. The key verb "makes" indicates that venue is proper in this district. *See United States v. Blecker*, 657 F.2d at 632 (word "makes or presents" false claim to government agency under 18 U.S.C. § 287 supports venue either where claims are prepared or where they are presented to the government agency).

Moreover, under the general venue statute [5] an offense begun in one district and completed in another, or committed in more than one district, may be prosecuted in any district in which such offense was "begun, continued or completed." Several other circuits have held that venue under 18 U.S.C. § 1001 lies either where a false statement is prepared or where it is filed. *See United States v. Rigdon*, 874 F.2d 774, 779–80 (11th Cir.), *cert. denied*, —— U.S. ——, 110 S.Ct. 374, 107 L.Ed.2d 360 (1989); *United States v. Mendel*, 746 F.2d 155, 165 (2d Cir.1984), *cert. denied*, 469 U.S. 1213, 105 S.Ct. 1184, 84 L.Ed.2d 331 (1985); *United States v. Ruehrup*, 333 F.2d 641, 644 (7th Cir.), *cert. denied*, 379 U.S. 903, 85 S.Ct. 194, 13 L.Ed.2d 177 (1964); *Imperial Meat Co. v. United States*, 316 F.2d 435, 440 (10th Cir.), *cert. denied*, 375 U.S. 820, 84 S.Ct. 57, 11 L.Ed.2d 54 (1963); *De Rosier v. United States*, 218 F.2d 420, 423 (5th Cir.), *cert. denied*, 349 U.S. 921, 75 S.Ct. 660, 99 L.Ed. 1253 (1955). This Court is persuaded to the same result.

Defendants, however, argue that this case falls within the ambit of *Reass* and *Travis*, calling this a "false filing case" and urging that the offense here is the act of filing a false document with the SEC in the District of Columbia. This argument must

---

**5.** 18 U.S.C. § 3237 reads:

(a) Except as otherwise expressly provided by enactment of Congress, any offense against the United States begun in one district and completed in another, or committed in more than one district, may be inquired of and prosecuted in any district in which such offense was begun, continued or completed.

be rejected because *Reass* and *Travis* do not apply in the present case.

In *Reass*, the defendant was convicted of violating 12 U.S.C. § 1441(a) which imposed criminal penalties upon anyone who makes any statement, knowing it to be false, for the purpose of influencing in any way the action of a Federal Home Loan Bank upon an application for a loan. The Fourth Circuit held that venue was proper only where the false statement was filed because the essence of the statute was the making of a false statement to a bank *for the purpose of influencing the bank.* The Court stated:

> [t]he gist of the offense is the attempt to influence the corporation ... and communication of the false statements to the corporation constitutes the very essence of the crime.... The mere assembling of the material and its arrangement in a written composition containing the misrepresentation of fact can have no effect, and it is only when they are communicated to the lending bank that the crime takes place.

99 F.2d at 755. (citations omitted). Clearly, the *Reass* Court identified "for the purpose of influencing" as the key verbs in 12 U.S.C. § 1441. Here, however, as already noted, the essence of 18 U.S.C. § 1001 is in making the false statement, and thus the key verb in the statute at issue is "making." Consequently, defendants' reliance on *Reass* is not justified.

The Supreme Court's decision in *Travis* is similarly distinguishable. In that case, the defendant was charged and convicted of violating Section 9(h) of the National Labor Relations Act and Section 35(A) of the Criminal Code (a statute which has been replaced by 18 U.S.C. § 1001) for making and filing a false non-communist affidavit. The Supreme Court reversed the conviction, finding that venue lay not where the affidavit was made, but where it was filed with the National Labor Relations Board. The Supreme Court held that venue was proper only where the false statement was filed because "the locus of the offense ha[d] been carefully specified; and only the single act of having a false state-

ment at a specified place [was] penalized." *Travis v. United States*, 364 U.S. at 637, 81 S.Ct. at 362.

Subsequent cases, including the Fourth Circuit, have emphasized that *Travis* turned on the peculiar wording of Section 9(h) of the National Labor Relations Act. *United States v. Blecker*, 657 F.2d at 633 (recognizing that "courts have narrowly construed *Travis* to apply only in the context of the unique statutory language dealt with in that case"); *United States v. Slutsky*, 487 F.2d 832, 839 n. 8 (2d Cir.1973) ("the decision [in *Travis* ] surely was meant to be confined to the facts based on the unusual statute involved"), *cert. denied*, 416 U.S. 937, 94 S.Ct. 1937, 40 L.Ed.2d 287 (1974).

The Court is persuaded by this interpretation of *Travis* and thus finds, like other courts, that "*Travis* merely limits the general venue statute in accord with Congress' specific mandate." *United States v. Mendel*, 746 F.2d at 165; *see United States v. Herberman*, 583 F.2d 222, 227 (5th Cir. 1978).

In the case at bar, unlike in *Travis*, 18 U.S.C. § 1001 does not carefully identify the locus of the crime. Therefore, the provisions of the general venue statute, 18 U.S.C. § 3237(a), apply. Because Section 1001 proscribes making or using any false documents, and because the false document in this case was made in the District of Maryland, venue is proper in this district. Accordingly, Defendants' motion to dismiss Count 2 on this basis will be denied.

### B. Counts 3 Through 14

■ Defendants argue that Counts 3 through 14 should be dismissed because the conduct alleged in those counts is not criminally sanctioned under Section 10(b) and Rule 10b–5 of the 1934 Act. These counts charge that defendants "unlawfully, willfully, knowingly, by the use of means and instrumentalities of interstate commerce and the mails, (a) did employ devices, schemes, and artifices to defraud, and (b) engage in acts, practices and courses of business that operated as a fraud and deceit on IEI and the shareholders of IEI and

the investing public in connection with the sale of IEI stock based upon confidential non-public information" concerning IEI's deteriorating financial condition in violation of Sections 10(b), 32(a) and Rule 10b–5. Each count relates to a specific transaction, with the first trade taking place on April 24, 1986.

Defendants suggest that Congress did not intend to criminalize insider trading under Section 10(b) or Rule 10b–5 because: 1) the legislative history of these provisions does not mention insider trading; and 2) Congress explicitly refused to criminalize "short-swing" trading by insiders in Section 16(b) of the 1934 Act, 15 U.S.C. § 78p(b). The Court rejects both arguments.

Section 10(b), 15 U.S.C. § 78j(b) provides:

It shall be unlawful for *any* person, directly or indirectly, by use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b). (emphasis added). In 1942, pursuant to Section 10(b), the SEC promulgated Rule 10b–5, 17 C.F.R. § 240.10b–5 which provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5.

Section 32(a) of the 1934 Act criminally sanctions any person who willfully violates Section 10(b). 15 U.S.C. § 78ff(a).

In the present case, it is clear that defendants' conduct as charged falls within the language of Section 10(b) and Rule 10b–5. It is well established that corporate insiders commit fraud under Section 10(b) and Rule 10b–5 when they engage in securities transactions with the shareholders of their company without disclosing to them non-public information that is material to the transaction. In *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833 (2d Cir.1968), (en banc), *cert. denied*, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969), the Second Circuit held that corporate insiders violated Rule 10b–5 when they purchased stock on the open market with material inside information. Since that case, it has been black letter law that:

anyone in possession of material inside information must either disclose it to the investing public, or, ... must abstain from trading in or recommending the securities concerned while such information remains undisclosed.

*Id.* at 848 (emphasis added). *See In re Cady, Roberts & Co.*, 40 S.E.C. 907, 911–12 (1961); *Speed v. Transamerica Corp.*, 99 F.Supp. 808, 842–43 (D.Del.1951). These decisions found that the purpose of the securities fraud prohibitions is to prevent corporate insiders from using their positions to take unfair advantage of uninformed market participants. *In re Cady, Roberts*, 40 S.E.C. at 911–12; *Speed v. Transamerica Corp.*, 99 F.Supp. at 829.

Although few insider trading prosecutions took place for the first fifty years of the history of the federal securities laws, in *Chiarella v. United States*, 445 U.S. 222, 227, 100 S.Ct. 1108, 1114, 63 L.Ed.2d 348 (1980), the Supreme Court approved of this use of Rule 10b–5 in a criminal context, noting that "the relationship between a corporate insider and the stockholders of his corporation gives rise to a disclosure obli-

gation is not a novel twist of the law." The Court went on to state:

> Application of a duty to disclose prior to trading guarantees that corporate insiders, who have an obligation to place the shareholder's welfare before their own, will not benefit personally through fraudulent use of material, non-public information.

*Id.* at 230, 100 S.Ct. at 1115–16 (footnote omitted). Thus, the *Chiarella* decision reaffirmed the necessity of an existing fiduciary relationship between the trader and those individuals who may be entitled to know the information used to trade. *Id.* at 235, 100 S.Ct. at 1118. Significantly, while construing 10b–5 in a criminal context, the Court did not call into question the legitimacy of the underlying prosecution.

A subsequent Supreme Court case reemphasized the principles of the *Chiarella* decision. In *Dirks v. SEC,* 463 U.S. 646, 653–54, 103 S.Ct. 3255, 3260–61, 77 L.Ed.2d 911 (1983), the Court stated that for purposes of 10b–5, a corporate insider owes shareholders with whom he trades a duty to disclose all material information, and that a corporate insider who "fails to disclose material, non-public information before trading on it and thus makes "secret profits'," commits fraud under Rule 10b–5.

These cases clearly refute defendants' argument that Congress did not intend corporate insiders to be covered under 10(b) and Rule 10b–5. Congressional failure to legislatively amend this longstanding judicial acceptance of the use of Rule 10b–5 compels the Court to adopt the Government's position on this issue. *See Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 733, 95 S.Ct. 1917, 1924, 44 L.Ed.2d 539 (1975).

Despite this abundant authority, however, defendants nevertheless argue that

because Congress did not mention insider trading when it enacted Section 10(b) or Rule 10b–5, Congress did not intend to criminalize insider trading under these provisions.

This argument can quickly be dismissed. The legislative history of this section makes clear that Section 10(b) was a broad, anti-fraud provision intended to cover the full range of fraudulent conduct that human ingenuity might devise. The Supreme Court has recognized that Section 10(b), as implemented by Rule 10b–5, "was designed as a catch-all clause to prevent fraudulent practices." *Chiarella,* 445 U.S. at 226, 100 S.Ct. at 1113 (citing *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 202, 96 S.Ct. 1375, 1385, 47 L.Ed.2d 668 (1976)); *see Affiliated Ute Citizens v. United States,* 406 U.S. 128, 158, 92 S.Ct. 1456, 1474–75, 31 L.Ed.2d 741 (1972) (repeated use of word "any" in Rule 10b–5 evinces Congressional intention to draft Rule broadly).

Although the legislative history of Section 10(b) identifies some practices that Congress sought to prohibit in 10b–5, it is clear that Congress neither attempted nor purported to provide a comprehensive list of the areas that might be covered under Section 10b–5. As the Supreme Court has stated, "Section 10(b) was written to enable the Commission 'to deal with new manipulative [or cunning] devices,'" *Ernst & Ernst v. Hochfelder,* 425 U.S. at 201–03, 96 S.Ct. at 1385, and must be read "flexibly, not technically and restrictively." *Superintendent of Ins. v. Bankers Life & Casualty Co.,* 404 U.S. 6, 12, 92 S.Ct. 165, 168–69, 30 L.Ed.2d 128 (1971). In light of this history, the Court believes that the statute and the Rule certainly were intended to be broad enough in scope to cover the species of fraud that is charged in Counts 3 through 14 of the indictment.[6]

---

6. In construing Congressional intent, the Court is also persuaded by Congress' statements accompanying the Insider Trading Sanctions Act of 1984. *See Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 380–81, 89 S.Ct. 1794, 1801–02, 23 L.Ed.2d 371 (1969) (subsequent legislative history "entitled to great weight in [prior] statutory construction").

This Act provides for civil penalties against persons convicted of or enjoined from insider trading. The House Report accompanying the Act, H.Rep. No. 98-355, 98th Cong., 1st Sess. (1983) (*reprinted in* [1984] U.S.Code Cong. & Admin.News 2274), noted and approved of using Rule 10b–5, stating: "Since the seminal case of *In re Cady, Roberts & Co.,* and *SEC v. Texas Gulf Sulphur Co.,* it has been clear that trading

Although defendants do not dispute that criminal penalties attach to Rule 10b–5 violations, defendants, nonetheless, contend that Section 16(b)'s legislative history suggests that Congress implicitly carved out an exception and intended not to criminally sanction fraudulent securities trading by corporate insiders under Section 10(b) and Rule 10b–5. The crux of their argument is that "there is no evidence that Congress intended Section 10(b) to impose criminal liability for the same conduct as to which, in Section 16(b), it had expressly considered and rejected the criminal sanction in favor of strict liability."

The central flaw in defendants' argument is that Section 16(b) and Rule 10b–5 do not apply to the same conduct; Section 16(b) requires no showing of fraud, while Section 10(b) and Rule 10b–5 only cover fraud.

 As defendants note, Section 16(b)[7] is a strict liability provision. *Foremost–McKesson, Inc. v. Provident Secur. Co.*, 423 U.S. 232, 251, 96 S.Ct. 508, 519, 46 L.Ed.2d 464 (1976). It prohibits all sales, with a few exceptions, by corporate insiders of securities in their corporations that they purchased within the prior six months. The Supreme Court has stated that Section 16(b) imposes strict liability upon all transactions occurring within the statutory time period, *"without proof of actual abuse or insider information, and without proof of intent to profit on the basis of such information." Kern County Land Co. v.*

*Occidental Petroleum Corp.*, 411 U.S. 582, 585, 93 S.Ct. 1736, 1739–40, 36 L.Ed.2d 503 (1973) (emphasis added). "Such arbitrary and sweeping coverage was deemed necessary to insure the optimum prophylactic effect." *Bershad v. McDonough*, 428 F.2d 693, 696 (7th Cir.1970), *cert. denied*, 400 U.S. 992, 91 S.Ct. 458, 27 L.Ed.2d 440 (1971); *Blau v. Lehman*, 368 U.S. 403, 414, 82 S.Ct. 451, 457, 7 L.Ed.2d 403 (1962). Section 16(b), therefore, is a flat, objective rule that is designed to operate mechanically.[8]

Section 10(b) and Rule 10b–5, on the other hand, only apply to short-swing trading when there is proof that an insider engaged in the fraudulent use of material, non-public information. The mere short-swing sale of securities, standing alone, does not constitute violation of these provisions. Thus, the conduct prohibited in Section 10(b) and Rule 10b–5 is more limited than that covered by Section 16(b), and requires a far more serious showing. *See* 5 Jacobs, *Litigation and Practice under Rule 10b–5* § 3.02(g)(iii)(A)(I), at 1–154.130 (2d ed. 1990).

It is not surprising that Congress chose not to impose criminal sanctions for the broad range of conduct in Section 16(b). Nor is it inconsistent that Congress would nonetheless allow criminal penalties to be imposed in those cases where fraud and abuse of inside information is in fact demonstrated. Indeed, the contrary would be surprising.

---

by corporate officials and employees on information gained in their employment violates fiduciary duties and violates the federal securities laws." *Id.* at 14, 1984 U.S.Code Cong. & Admin. News, p. 2287.

The Report went on to endorse this use, noting "the Commission has appropriately used the antifraud provisions to remedy unlawful trading and tipping by persons in a variety of positions of trust and confidence who have illegally acquired or illegally used material non-public information." *Id.* at 4, 1984 U.S.Code Cong. & Admin.News, p. 2277. The Report stated that "the abuses sought to be remedied [by section 10(b)] were not limited to actions of corporate insiders and large shareholders." *Id.* at 3, 1984 U.S.Code Cong. & Admin.News, p. 2276.

7. Section 16(b) provides, *inter alia*, that a corporate insider must surrender to the issuer "any

profit realized by him from any purchase and sale, or any sale and purchase, of any equity security of such issuer ... within any period of less than six months." 15 U.S.C. § 78p(b).

8. An insider can be liable under Section 16(b) regardless of his knowledge of inside information, motive, intent, good faith, clean heart or unawareness of the implications of the transactions. 5 Jacobs, *Litigation and Practice Under Rule 10b–5* § 3.02[g][iii][A][V], at 1–154.155 to .157 (2d ed. 1990) (citations omitted). A Section 16(b) cause of action has three elements: "(1) a 10% beneficial owner, a director, or an officer; (2) a sale and purchase or a purchase and sale within the six-month period; and (3) a profit realized." *Lewis v. Riklis*, 446 F.Supp. 582, 584 (S.D.N.Y.), *aff'd*, 575 F.2d 416 (2d Cir.1978).

In sum, Congress' failure to impose criminal sanctions for nonfraudulent conduct under Section 16(b) does not mean that it intended to immunize insider trading that is fraudulent under Section 10(b) and Rule 10b–5. As the above discussion illustrates, the defendants' contention fails to grasp the essential differences and purposes of Sections 16(b) and 10(b). The statutory language, legislative history and judicial interpretations of Section 10(b) and Rule 10b–5 support the Court's conclusion that the conduct charged in Counts 3 though 14 falls within the ambit of these provisions. Accordingly, defendants' motion to dismiss these counts on this basis will be denied.

In reaching this conclusion, the Court also rejects the final argument in defendants' motion to dismiss. Lang and Trexler suggest that they did not have "fair notice" that they could be prosecuted for the type of fraud alleged in counts 3 through 14. As the above discussion demonstrates, however, it is well settled that corporate insiders who trade in their company's securities without disclosing material, nonpublic information violate Section 10(b) and Rule 10b–5. Moreover, it is clear on the face of the statute that violations of Rule 10b–5 carry criminal penalties. It thus follows that defendants had sufficient notice of the criminal liability for the securities fraud they are charged with committing, and so long as they had fair notice that their alleged conduct is fraudulent, Lang and Trexler may be prosecuted for their alleged misconduct. *See United States v. Ingredient Technology Corp.*, 698 F.2d 88, 96 (2d Cir.), *cert. denied*, 462 U.S. 1131, 103 S.Ct. 3111, 77 L.Ed.2d 1366 (1983); *United States v. Newman*, 664 F.2d 12, 19 (2d Cir.1981); *United States v. Naftalin*, 441 U.S. 768, 778, 99 S.Ct. 2077, 2084, 60 L.Ed.2d 624 (1979); *United States v. Persky*, 520 F.2d 283, 288 (2d Cir.1975).

Accordingly, the Court will deny defendants' motion to dismiss Counts 3 through 14 on this basis.

## II. MOTION TO SET A PRE–TRIAL RETURN DATE FOR SUBPOENAS *DUCES TECUM*/ SEC'S MOTION TO QUASH SUBPOENA *DUCES TECUM*

Also before the Court are defendants' motion to set a pretrial return date for subpoena *duces tecum* and the motion of the SEC to quash subpoena *duces tecum.*

Defendants seek production of 1) notes of Mr. Hulse's statements to SEC staff members taken during Mr. Hulse's proffer session with the Government; and 2) and certain correspondence between Mr. Hulse's counsel and the SEC.

 Enforcement of a pre-trial subpoena is at the discretion of the District Court. *United States v. Nixon*, 418 U.S. 683, 702, 94 S.Ct. 3090, 3104–05, 41 L.Ed.2d 1039 (1974). Pre-trial production under a Rule 17(c) subpoena is limited to those documents which are relevant, specifically designated and admissible. *Id.* at 700, 94 S.Ct. at 3104. A subpoena *duces tecum* should be quashed when it calls for privileged matter. *In re Martin Marietta Corp.*, 856 F.2d 619 (4th Cir.1988), *cert. denied*, 490 U.S. 1011, 109 S.Ct. 1655, 104 L.Ed.2d 169 (1989).

In the present case, production of the documents turns on their admissibility. The SEC moves to quash defendants' subpoena on the grounds that the documents requested are privileged. The SEC claims that the notes taken during Hulse's proffer session are protected under the work product privilege.[9] They contend that the law enforcement privilege protects both the proffer session notes and the SEC-attorney correspondence.

### A. The Work Product Doctrine

 The SEC notes of the Hulse proffer session are clearly attorney work product. *Hickman v. Taylor*, 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947). Defendants contend that the notes are admissible because the SEC waived the work-product

---

9. The SEC also claims that the notes fall under the deliberative process privilege. The Court

does not reach the merits of this argument.

privilege by making testimonial use of the notes during the Government proffer session. They cite *In re Martin Marietta Corp.* (supra) to support their argument.

In *Martin Marietta,* defense counsel took notes at witness interviews. Later, the company, in an attempt to avoid a possible prosecution, presented the United States Attorney with a Position Paper which disclosed statements made by those witnesses. The Fourth Circuit found that this constituted "testimonial" use of the witness statements and that such use waived the work product privilege as to the Position Paper as well as to the statements it contained. *Martin Marietta,* 856 F.2d at 625.

The SEC argues that *Martin Marietta* does not apply in this case because here no testimonial use was made of the notes or of their contents.

This Court finds the SEC's position persuasive. In *Martin Marietta,* three factors contributed to the Court's finding of testimonial use. The Court determined that the Government and Martin Marietta were adversaries, that Martin Marietta made express assurances that it was providing complete disclosure, and that Martin Marietta made those disclosures in active attempt to settle a controversy existing between itself and the Government. *Id.* at 625.

The present case is distinguishable from *Martin Marietta* because none of the factors underlying a finding of testimonial use are present. Significantly, the SEC and the Government are not adversaries in this instance and there is no controversy which any "disclosure" could have been designed to settle. Here, rather than turning the notes or their contents over to the Government for the purpose of gaining strategic benefit, the SEC staff used the notes to advise their client about the subject investigation.

Thus, *Martin Marietta* does not compel this Court to find a waiver of the work

product privilege as to the SEC's notes of the Hulse proffer session.

Defendants also rely on *United States v. Nobles,* 422 U.S. 225, 95 S.Ct. 2160, 45 L.Ed.2d 141 (1975) to support their position that the SEC waived the privilege. In *Nobles,* defense counsel hired a private investigator to interview prosecution witnesses and later used the investigator's report in his cross-examination of those witnesses. The defense then attempted to call the investigator as a witness. The Court found that the defendant, "by electing to present the investigator as a witness, waived the [work product] privilege with respect to matters covered in his testimony". *Id.* at 239, 95 S.Ct. at 2170.

The facts of the present case differ significantly from the situation in *Nobles.* There, defense counsel attempted to put on testimony regarding material as to which he was simultaneously asserting the work product privilege. Here, the SEC has not put its notes or their contents forward in any sort of adversarial proceeding, but has kept those notes for internal use only. Consequently, the SEC has not made testimonial use of the Hulse proffer session under the *Nobles* test.

This Court finds that there has been no waiver of the work product privilege as to the SEC's proffer session notes.

■ Defendants also seek to circumvent the work product privilege by alleging that they need the documents for their defense. Defendants fail to support this argument with the requisite showing of substantial need. *In re Sealed Case,* 856 F.2d 268, 273 (D.C.Cir.1988).[10]

*B. The Law Enforcement Privilege*

■ The SEC claims that both the SEC-attorney correspondence and the Hulse proffer session notes are protected by the law enforcement privilege and are therefore not discoverable. The SEC has an on-going investigation of this matter from which a civil enforcement action may result. The SEC claims that the SEC-attor-

**10.** Defendants must make an especially strong showing of need in order to discover work product which reflects evaluation of oral statements made by witnesses. *Upjohn v. United States,* 449 U.S. 383, 399, 101 S.Ct. 677, 687, 66 L.Ed.2d 584 (1981).

ney communications in question reveal the financial calculations made by SEC staff regarding the amount of penalties they intended to seek in settlement of charges against Hulse. They claim that the notes reflect those parts of Hulse's story which the SEC lawyers found important. This information must remain confidential, they contend, because its production could jeopardize the on-going investigation.

The law enforcement privilege has been recognized in several circuits. *See, e.g., In re Department of Investigation,* 856 F.2d 481, 483–484 (2d Cir.1988) (denying production pursuant to Rule 17(c) subpoena citing law enforcement privilege); *Friedman v. Bache Halsey Stuart Shields, Inc.,* 738 F.2d 1336 (D.C.Cir.1984). The purpose behind this privilege is to prevent interference with an on-going investigation. *In re Department of Investigation,* 856 F.2d at 484.

The SEC argues that the Fourth Circuit has recognized the principle underlying the law enforcement privilege. The SEC cites *Willard v. IRS,* 776 F.2d 100 (4th Cir.1985) in which a defendant sought EEOC documents through the Freedom of Information Act ("FOIA"). In that case, the EEOC argued that documents compiled for law enforcement purposes are exempted from discovery under FOIA. The court agreed, finding that premature production of such documents could hinder other enforcement actions. Although *Willard* is a FOIA case, the logic of the discovery exception applies here. As in *Willard* one party is seeking documents integral to the continuing investigation of another party.

This Court finds that the documents in question are integral to the continued investigation of a possible civil enforcement action. The proffer session notes reflect selective recording of Hulse's statements. Such selective note-taking can provide clues as to the focus of the on-going investigation. *See Willard v. IRS,* 776 F.2d at 103. The notes also contain SEC evaluations of Hulse's statements.

The SEC-attorney communications relate to the terms of the Hulse proffer. Production of the correspondence would reveal what the SEC knows about the activity under investigation and what portions of that activity it feels are important.

Because the subpoenaed documents are protected by the law enforcement and work product privileges, the Court will grant the SEC's motion to quash.

The law firms of Kutak Rock & Campbell and McGuire, Woods, Battle & Boothe also move to quash the subpoenas issued to them. This Court will grant these motions in part as set forth below. Those documents which are protected by the work product doctrine and as to which there has been no waiver will not be produced.

The subpoenas call for the production of two types of documents:

"1) Any and all notes, memoranda, summaries, recordings, or other documents relating to any meetings, interviews, proffers, or debriefings, between or involving Henry H. Hulse (and/or any of his legal counsel or other representatives) and representatives of the Security and Exchange Commission (or its representatives) and/or the Office of the United States Attorney for the District of Maryland.

2) Any and all proffers of actual or proposed testimony, drafts thereof, or other documents of any type provided by Henry H. Hulse (and/or any of his legal counsel or other representatives) to the Securities and Exchange Commission (or its representatives) and/or the Office of the United States Attorney for the District of Maryland (or its representatives)."

These documents are not protected by the attorney-client privilege because they do not involve private communications between Hulse and his counsel.

The documents requested clearly fall within the ambit of the work product privilege as they were all prepared in anticipation of litigation. Here, however, there may have been a waiver of that privileges as to some of the documents.

The law firms must produce only those responsive documents which they have already provided to the SEC or the Govern-

ment because such disclosure constitutes a waiver of the work product privilege. *In re Doe*, 662 F.2d 1073, 1081 (4th Cir.), *cert. denied*, 455 U.S. 1000, 102 S.Ct. 1632, 71 L.Ed.2d 867 (1981).